**SEALED**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2009 APR 29 PM 3: 48

LORETTA G. WHYTE
CLERK

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

UNITED STATES OF AMERICA,
THE STATE OF LOUISIANA, THROUGH
THE MEDICAL ASSISTANCE PROGRAMS
INTEGRITY LAWS
ex rel. MARK SWIFT

**PLAINTIFFS**

**VERSUS**

JAMIE MARTIN, CURTIS LANE, JAMES
KELLY, JOHN SABALASKEY, ALLEN
PALLES, ANDREW M. PAUL, KEVIN SWAN,
E. B. MARTIN, JR., JOHN HENNESSEY,
MALCOLM KOSTUCHENKO, MICHAEL L.
ANTHONY, HEALTH ALLIANCE, LLC,
HEALTH ALLIANCE HOLDINGS, INC.,
HA ACQUISITION LLC, HA HOLDINGS,
INC. and PREVALANCE HEALTH

**DEFENDANTS**

**CIVIL ACTION**

NO. **09 - 3406**

**SECTION:**

MAGISTRATE **SECT. S MAG. 2**

**COMPLAINT UNDER THE
FEDERAL AND FALSE CLAIMS
ACT**

**JURY TRIAL REQUESTED**

**FILED *IN CAMERA* AND
UNDER SEAL**

## COMPLAINT FOR DAMAGES

Relator, Mark Swift, brings this Complaint against the defendants named below on behalf

of the United States of America, its departments and agencies, including the Department of

Health and Human Services ("DHHS"), as well as the Medical Assistance Programs Integrity

Laws of the State of Louisiana, as Plaintiffs, showing the Court as follows:

### Jurisdiction

1.      This is a case brought by the Relator against the Defendant the Federal False Claims

Act, 31 USC §§ 3729 *et seq.*

1

Fee $350
Process
X Dktd
CtRmDep
Doc. No.

2.      This Court has jurisdiction of this action asserting claims under the laws of the United States pursuant to 28 USC § 1331.

3.      This Court has jurisdiction of this action in which the United States is a Plaintiff pursuant to 28 USC § 1345.

4.      This Court has jurisdiction of the claims asserted herein pursuant to the Federal False Claims Act, 31 USC § 3729 *et seq.*

5.      This case is also brought by the Relator against the Defendants pursuant to the Louisiana Medical Assistance Programs Integrity Law, LSA R.S. 46:437 *et seq.*, and it is a civil *qui tam* action filed pursuant to the provisions of LSA R.S. 46:439.1 *et seq.*

6.      This Court has jurisdiction of the claims asserted under the Louisiana Medical Assistance Programs Integrity Laws pursuant to the provisions of the Federal False Claims Act, 31 USC § 3732(b) and 28 USC § 1367.

7.      This Court may exercise personal jurisdiction over the Defendants pursuant to 31 USC § 3732(a) because at least one of the Defendants resides or transacts business in this district.

**Venue**

8.      Venue lies in the district under 31 USC § 3732(a) because at least one of the Defendants can be found in this district, the Defendant transacts business in this district, and one or more acts proscribed by 31 USC § 3729 *et seq.* occurred in this district, and venue is also proper pursuant to 28 USC § 1391(b)(c) because at least one of the Defendants resides or transacts business in this district.

9.      The Plaintiff, the United States of America by and through its department, DHHS, particularly the Center for Medicare and Medicaid services ("CMS") within DHHS, is responsible

for administering federal health programs, including Medicare and Medicaid.

10.    The Medicaid program is a state and federal assistance program to provide payment of medical expenses for low income and disabled beneficiaries.  The Medicaid program was also created in 1965 entitled XIX of the Social Security Act.  Funding for Medicaid is shared between the federal government and those states participating in the program; on the funding apportionment varies from state to state, and in the State of Louisiana is approximately 70 percent federal dollars and 30 percent monies from the State of Louisiana.  The primary purpose of the Medicaid program is to enable each state, as far as practicable under the circumstances in such state, to furnish medical assistance on behalf of families with dependent children of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the cost of necessary medical services.  States are required to provide certain basic medical services, such as in-patient hospital care to needy individuals.  Medicaid covers approximately 47 million individuals nationwide, including children, the aged, blind, and/or the disabled, and people who are eligible to receive federally assisted income maintenance payments.  States may also cover prescription drugs and other services under the Medicaid program.  42 USC § 1396(d)(a)(12).

11.    The Plaintiff, the State of Louisiana, by and through its Department of Health and Hospitals, particularly the Louisiana Medicaid Health Services Financing Division ("Louisiana Medicaid"), is responsible for administering the joint federal state health care program known as Medicaid here in the State of Louisiana.

**Defendants**

12.    Defendant, Health Alliance, LLC ("Alliance') is an Illinois limited liability company.  Its principal place of business is Jackson, Mississippi.

3

13.    Defendant Health Alliance Holdings, Inc. ("HAH") is a Delaware Corporation with its principal place of business in Illinois.

14.    Defendant HA Acquisition, LLC ("Acquisition") is a Mississippi limited liability company. Its principal place of business is located in Jackson, Mississippi. Acquisition, formed in November of 2004, claims to now own 100 percent of Health Alliance LLC.

15.    Defendant HA Holdings, Inc. ("Holdings"), is a Delaware corporation with its principal place of business in Illinois.

16.    Defendant Prevalence Health, is a Corporation organized under the laws of the State of Delaware, with a place of business located in the State of Louisiana, particularly in Zachary, Louisiana. Prevalence Health also operates under a trade name of "TED'S MEDS", which is listed as a division of Prevalence Holdings, LLC. Upon information and belief, Prevalence Health is a successor entity to Health Alliance, LLC, Defendant herein, with divisions in Illinois, Mississippi, Louisiana, and Florida.

17.    Defendant Jamie Martin, a citizen and resident of Jackson, Mississippi, was a director and shareholder of HAH, a director and shareholder of Holdings.

18.    Defendant John Hennessey, is a citizen and resident of Kenilworth, Illinois, was an officer (Vice President) of Health Alliance LLC and Holdings during the relevant period.

19.    Defendant Michael L. Anthony, a resident and citizen of Ridgeland, Mississippi, was an officer (Executive Vice President) of HA Acquisition and Health Alliance LLC during the relevant periods.

20.    Defendant Curtis Lane, is on information and belief and a citizen and resident of New York, was a director of HAH before the May 2003 reorganization and was a director of

4

Holdings and an employee or agent of MTs Health Alliance, LLC during the relevant time periods.

21.     Defendant Andrew M. Paul, is a citizen and resident of Bronxville, New York, was a director of HAH before the May 2003 reorganization and was a director of Holdings, an employee of Ashcroft Associates, LLC, and was affiliated with MTS Health Alliance, LLC during the relevant time period.

22.     Defendant Kevin Swan, a citizen and resident of Libertyville, Illinois, was a director of Holdings, an officer of Health Alliance LLC, and an officer of Holdings during the relevant time period.

23.     Defendant Malcolm Kostuchenko, on information and belief a citizen and resident of New York, was an active member of the Board of Directors  of HAH during the relevant time period.

24.     Defendant E. B. Martin, Jr., a citizen and resident of Jackson, Mississippi, is the Chairman of Acquisition, is on information and belief the manager and a member of EBM Ventures, and is the husband of Jamie Martin.

25.     Defendant John Sabalaskey, a citizen and resident of Lake Forest, Illinois, was an officer (Chief Financial Officer) of Health Alliance LLC and Holdings during the relevant time period.

26.     Defendant Allen Palles, a resident and citizen of Fountain Hills, Arizona, was an officer (Chief Financial Officer 2001 to present) of Health Alliance LLC and Holdings, during the relevant time period and later employed as a consultant to Alliance and Holdings.

27.     Defendant James Kelly, is a citizen and resident of Newton, Connecticut, was an officer of Health Alliance LLC and Holdings and Acquisition, and a director (Chairman of the

Board) of Holdings during the relevant time period.

**Allegations**

28.    This is a *qui tam* action brought on behalf of the United States Government throught the Centers for Medicare and Medicaid Services ("CMS") and the State of Louisiana Medical Assistance Programs (Louisiana Medicaid) of the State of Louisiana for the defrauding of the Department of Health and Hospitals ("DHH") by Defendants through a third party administration plan for the provision of diabetes and asthma medication to Louisiana Medicaid recipients.

29.    Defendant Alliance was formed in 1997 by Relator Mark Swift to sell diabetic and asthma patient care supplies and medications through the mail to state Medicaid beneficiaries and to enrollees in Third Party Administration Plans (TPA).

30.    It obtained contracts from States to process orders and then to deliver medical prescriptions and supplies.  Discounts were made possible by the volume of patients served and efficient administration of the orders.  The contracts with states provided a large volume of patients with regular prescription needs.  Health Alliance LLC jointly held contracts, provider numbers, and pharmacy numbers within the states and entities for which it provided services.

31.    In March of 2001, Health Alliance LLC began to service Illinois Medicaid participants under a contract with the Illinois Department of Public Aid that covers about 33,000 Medicaid participants with diabetes, and began to service diabetic members of WellCare HMO of Tampa, Florida under a preferred provider agreement covering about 5,000 of its members.

32.    In July of 2001, Health Alliance LLC executed a contract with the Florida Agency for Health Care Administration to be the exclusive mail order provider of diabetes care products to about 5,700 Medicaid recipients.  In December of 2001, Florida enacted a law that expanded Health

6

Alliance LLC's contract with its Agency for Health Care Administration to provide additional pharmacy products beginning on January 1, 2002.

33.    In February of 2002, Health Alliance LLC contracted with the Mississippi division of Medicaid for Health Alliance to be a preferred pharmacy provider to Mississippi Medicaid recipients.

34.    Substantial additional capital was required to fulfill these contracts.  In anticipation of the need for this capital, Defendant Health Alliance Holdings, Inc. ("HAH") was formed. Founded in 2001, HAH raised the necessary capital and acquired a membership interest in Defendant Health Alliance LLC.

### Defendants Scheme to Induce Louisiana DHH to Award the Exclusive Contract for Diabetes and Asthma Services and Drugs

35.    In December 2001 HAH and Health Alliance LLC ("collectively Health Alliance") were selected to enter final negotiations with the State of Louisiana for a five-year agreement to become the exclusive provider of diabetes and asthma treatment products to Louisiana Medicaid beneficiaries.

36.    The negotiations were conducted by the Louisiana Department of Health and Hospitals ("DHH") pursuant to the Medical Assistance Programs Integrity Law. Relator was present for the bulk of these negotiations as an Officer of Health Alliance prior to his removal by Defendants.

37.    DHH, in order to ensure performance and marketing to enroll sufficient numbers of Medicaid beneficiaries to achieve the expected savings, required Health Alliance to demonstrate sufficient financial viability to perform under the contract providing an additional amount of equity

to total eleven million dollars ($11,000,000.00).

38.     In addition to ensuring the operational viability of Health Alliance in general, DHH required the additional equity to make sure the State of Louisiana would merit its savings requirements.  The savings were to be realized through an extensive marketing campaign designed to enroll Louisiana Medicaid beneficiaries that would be billed at reduced prices under an exclusive contract.   This was to be approximately one million dollars of marketing and advertising to Medicaid beneficiaries per year.

39.     DHH was concerned that Health Alliance did not have the required capital to be able to conduct sufficient marketing without the required equity infusion.  Without a large enrollment base, the State of Louisiana would not see savings sufficient to justify an agreement with Health Alliance.

40.     Based on an internal analysis conducted by Defendants herein, approximately 30,000 patients were needed to be enrolled under this exclusive contract in order to achieve the minimum savings guaranteed in the contract with the Louisiana Department of Health and Hospitals.  The amounts necessary for mailing and marketing to the lists of beneficiaries provided by the Department would have only cost approximately $450,000 to achieve that minimum enrollment.

41.     Because this was an exclusive contract, the total savings, had the full enrollment been achieved, was estimated to be approximately thirty (30) million dollars per year over the five year life of the contract.

42.     To obtain this additional equity, on May 9, 2002, Health Alliance and its investors entered into a Securities Purchase Agreement with MTS Health Alliance, L.L.C. ("MTS") and Ashcroft Associates, LLC ("Ashcroft") through which MTS and Ashcroft contractually committed

to invest $11 million of equity in HAH, whose sole purpose was to comply with the equity requirements, made by DHH to obtain the exclusive diabetes and asthma services and drugs. **Exhibit 1**.

43.     Pursuant to the contemporaneously executed shareholders agreement, the board of directors of HAH was to consist of eleven members, five of whom were to be designated by a majority-in interest of the Existing Shareholders (then ADMG), three designated by MTS, and three by Ashcroft.  The directors initially representing ADMG were Mark Swift, John Hennessey, Jamie Martin, Douglas Cook, and Robert Kominsky.  The original MTS directors were Terrence Quinn, Curtis Lane, and Allen Palles.  The original Ashcroft directors were Andrew Paul, Malcom Kostuchenko, and H. Bradley Sloan.

44.     This agreement required MTS/Ashcroft to provide eleven million dollars of equity through the purchase of a new class of HAH stock, giving MTS/Ashcroft majority ownership in HAH.

45.     On July 22, 2002, the accounting firm Blackman Kallick Bartelstein LLP verified that MTS/Ashcroft had made equity investments of four million dollars ($4,000,000.00) and had committed to provide the additional seven million dollars as required in the May 9, 2002 Securities Purchase Agreement. **Exhibit 2.**

46.     The document identified from the accounting firm of Blackman Kallick Bartelstein LLP, was sent directly to the Louisiana Department of Health and Hospitals on behalf of Defendants, as a material inducement in order to procure the contracting question, states as follows:

a.     We obtained signed certificates from Terry Quinn, Chief Executive Officer, and Allen Palles, Chief Financial Officer, of Health Alliance which confirm their understanding of the agreement as well as the amounts received and the amounts yet to be received in accordance with the agreement are as follows:

    b.     MTS and Ashcroft purchased 15,000 shares of Series D-1 Senior Redeemable Convertible Preferred Stock of Health Alliance for $1,500,000 which was paid for in two installments of $750,000 each on May 9, 2002 and May 10, 2002.

    c.     MTS and Ashcroft purchased 25,000 shares of Series D-2 Senior Redeemable Convertible Preferred Stock of Health Alliance for $2,500,000 which was paid for on June 14, 2002.

    d.     MTS and Ashcroft, acting severally and not jointly, were willing to pay Health Alliance $7,000,000 per the agreement, for the purchase of 70,000 shares of its Series D-2 Senior Redeemable Convertible Preferred Stock prior to December 31, 2002 subject to an extension of up to three months with written notice to Health Alliance.

47.    In addition to the certifications received by the Defendant Allen Palles as Chief Financial Officer of Defendant Health Alliance, L.L.C. that the monies were to be paid in pursuant to DHH demands as an equity investment, the accounting firm took the further step of obtaining certifications from MTS and Ashcroft in the same opinion letter that all monies to be funded were to be for equity investment into the company, rather than in any debt instruments.

48.    On September 20, 2002, Curtis Lane, Managing Partner of MTS Health Partners LP, wrote to Helene Robinson, Executive Director of DHH, stating that "**MTS has funded $6 million of the $11 million. . . . It is anticipated that MTS will fund the balance of $5 million to complete its funding commitment, as required by the Company, prior to December 31, 2002.**" **Exhibit 4**. This letter confirms the substance of an Allen Palles letter of July 1, 2002 that Health Alliance LLC was receiving an equity infusion of eleven million dollars. **Exhibit 3**.

49.    In substantial reliance on the certification of investments and other matters referred to above, DHH signed an agreement collectively with Defendants Health Alliance, LLC and Health Alliance Holdings, Inc., for the exclusive provision of diabetes and asthma treatment products on November 25, 2002, with an effective date of March 1, 2003. **Exhibit 4 (Original Agreement)**.

50.    The agreement between the Department of Health and Hospitals and Defendant

Health Alliance and Holdings was amended to specifically provide for a contractual guarantee of 10 million dollar ($10,000,000.00) minimum savings to the Louisiana Medicaid Program, which was material consideration offered by Defendants to induce Louisiana Medicaid to execute this agreement. This agreement states that "Health Alliance has represented to the Department that it can achieve an annual savings of ten (10) million dollars in the Medicaid Pharmacy Program by entering into this addendum.  The principal consideration offered to the Department, and the basis for entering into this agreement, is the representation by Health Alliance that, by entering into this agreement, the Department will achieve ten (10) million dollars in savings annual in the Medicaid Pharmacy Program."  See **Exhibit  5 (Addendum to Original DHH Contract)**.

### Count I – Misrepresentation and Fraud in the Inducement

51.    Plaintiff hereby incorporates Paragraphs 1 through 50 above, as if pled herein.

52.    DHH required that Health Alliance secure an additional $11 million equity infusion before signing the DHH Agreement.  Exhibits 1, 2.

53.    On September 20, 2002, Curtis Lane, Managing Partner of MTS Health Partners LP, wrote to Helene Robinson, Executive Director of DHH, stating that MTs would complete its funding to Health Alliance prior to December 31, 2002.  **Exhibit 3**.  This letter confirms an Allen Palles letter of July 1, 2002 that Health Alliance LLC was receiving an equity infusion of eleven million dollars.  **Exhibit 6.**

54.    Based upon these statements, assurances, and gurantees, DHH entered into the agreement with Health Alliance and Holdings.

55.    Financial statements presented at the April 15, 2003 Board of Directors meeting of HAH included an HAH Balance Sheet that includes a Senior Subordinated Loan from

MTS/Ashcroft of $7,204,817 and a purchase of Convertible Redeemable Preferred Stock Series B-2 by MTS/Ashcroft for $4,245,995. **Exhibit 7**.

56.    This financial statement directly contradicts the certification letter of July 1 2002 sent by Allen Palles, **Exhibit 6**, and the letter of September 20, 2002 sent by Curtis Lane, both certifying compliance. **Exhibit 3**.

57.    On information and belief, Health Alliance was paid between $50 million and $75 million dollars under the DHH Agreement after falsely representing it was appropriately capitalized as per its agreement with DHH to be the exclusive provider.

58.    This misrepresentation was made to obtain payment of from medical assistance funds for Health Alliance through the awarding of the DHH Agreement in an attempt to defraud DHH and the State of Louisiana.

59.    Said false statements are in violation of the False Claims Act, 31 USC §3729 et seq. and Louisiana Revised Statute § 46:438.3(B) which states that, "No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance funds."

60.    As a direct result of the misrepresentation to induce the awarding of the contract, the Louisiana Medicaid program, and therefore the United States Government and the State of Louisiana have been damaged herein.

### Defendants Scheme to Transfer the Property (the Exclusive Contract) to Third Party Entities without DHH Knowledge or Consent as Required in the Contract

61.    On or about May 29, 2003, Defendant HA Holdings, Inc. ("Holdings"), was allegedly formed to acquire 100% of Defendant "Holdings's" membership interest in Health

Alliance LLC. After the May 2003 alleged reorganization, HAH was a 45 percent shareholder in Holdings.

62. Defendant HA Acquisition, LLC ("Acquisition") was formed in November of 2004, claims to now own 100 percent of Health Alliance LLC. It accomplished this by acquiring all of Holdings' membership interests in Health Alliance LLC for $10 plus minimal debt relief.

## Count II - Misrepresentation

63. Plaintiff hereby incorporates Paragraphs 1 through 62 above, as if pled herein.

64. The DHH Agreement listed HAH and Health Alliance LLC as the sole parties for the provision of diabetic and asthma treatment supplies under the exclusive contract.

65. The DHH Agreement states that HAH and Health Alliance LLC "shall not assign any interest in this contract and shall not transfer any interest in the same (whether by assignment or novation), without written consent of [DHH]." **Exhibit 4, at pg. 2**.

66. The DHH Agreement states that "[i]n consideration for goods delivered or services performed, [DHH] shall make all checks payable to [HAH and Health Alliance LLC] in the amounts and intervals as expressed or specified in the agreement." **Exhibit 4, at pg. 2**.

67. On May 29, 2003, HAH was allegedly reorganized and became a shareholder in Holdings, a newly formed Delaware corporation. **Exhibit 8**.

68. As part of the alleged reorganization, HAH assigned all of its assets to Holdings, including "all of [HAH]'s rights and interests under all contracts, agreements, plans, licenses, leases, sales orders, purchase orders and other commitments. . ." **Exhibit 8, at pp. 3, 12, 17**.

69. HAH's assets included the DHH Agreement and its right to collection of accounts under the DHH Agreement.

70.    DHH was not notified of this assignment and the assignment was not approved by DHH as required by the contract, but was concealed by Defendants.

71.    On information and belief, Health Alliance was paid between $50 million and $100 million dollars after the alleged reorganization.

72.    The lack of notification to and permission of DHH was a knowing misrepresentation by Defendants to obtain payment of medical assistance funds by an entity not a party to the exclusive contract, and an attempt to defraud DHH and the State of Louisiana.

73.    After the transfer, the remaining entity was nothing more than a shell burdened with the original debt, that had been previously concealed from, and falsely portrayed as equity to, DHH, preventing it from carrying out its required marketing to provide the bargained for savings to Louisiana Medicaid.

74.    As a direct result of the knowing concealment in violation of the express provisions of the contract, Defendants continued to submit claims for reimbursement in violation of its agreement with DHH.

75.    These actions and any claims submitted after the transfer are false in violation of the Federal False Claims Act, 31 USC §3729, et seq, and Louisiana Revised Statute § 46:438.3(B) states that, "No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance funds."

76.    As a direct result of the misrepresentations the Louisiana Medicaid program, and therefore the United States Government and the State of Louisiana have been damaged herein.

### Count III – Illegal Remuneration

77.    Plaintiff hereby incorporates Paragraphs 1 through 76 above, as if pled herein

14

78.     The DHH Agreement listed HAH and Health Alliance LLC as the parties for the provision of diabetic and asthma treatment supplies.

79.     The DHH Agreement states that "[i]n consideration for goods delivered or services performed, [DHH] shall make all checks payable to [HAH and Health Alliance LLC] in the amounts and intervals as expressed or specified in the agreement." **Exhibit 4, at pg. 2**.

80.     On May 29, 2003, HAH was allegedly reorganized and became a shareholder in Holdings, a newly formed Delaware corporation. **Exhibit 8**.

81.     After the alleged reorganization, Holdings received payment for goods delivered and services performed for which payment was due HAH under the terms of the DHH Agreement, in an attempt to defraud DHH and the State of Louisiana by receiving medical assistance funds without meeting statutory and contractual requirements.

82.     Said claims submitted by entities not contracted with the Louisiana Medicaid program are therefore false and in violation of the Federal False Claims Act, 31 USC §3729 et seq, and Louisiana Revised Statute § 46:438.2(A) which states in part that, "No person shall . . .receive. . . any remuneration. . . [i]n return for purchasing, leasing, or ordering. . .any good, supply, or services, or facility for which payment may be made, in whole or in part, under the medical assistance programs."

83.     As a direct result of the misrepresentations and false claims, the Louisiana Medicaid program, and therefore the United States Government and the State of Louisiana have been damaged herein.

### Defendants Knowing Failure to Market the Program as required by the Exclusive Contract with DHH, and Knowingly Submission of Inflated Bills in Violation of the Exclusive Contract with DHH

15

84.    During the periods of time in question, the Defendants herein not only falsely certified compliance with requirements in order to obtain the contracts in question, but the entities submitted false bills to the Medicaid programs of Louisiana, Mississippi, Illinois, and Florida for the full dollar amounts of providers not awarded an exclusive contract, rather than the reduced amount agreed to in these contracts.

85.    Instead of the promised expenditures for enrollment, Defendants failed and refused to make those expenditures, which was intended and expected by the Department to come from the equity infusion required as a material consideration for the agreement being awarded.

86.    As a direct result of these false bills being submitted to the state Medicaid programs, the expected intended savings of these exclusive contracts were denied to the various state Medicaid programs, representing actual damages to the state for bargained for savings promised by Defendants herein in order to induce the awarding of an exclusive contract.

87.    In addition, Defendants herein collectively benefited from both the awarding of the exclusive contract, as well as the submission of false bills for full value of diabetes and asthma services and drugs rather than the reduced rate agreed to and promised as an inducement to award the exclusive contract.

88.    Defendants also collectively benefited by their knowing and failure and refusal to expend those sums promised in order to market the services of Defendants herein to provide diabetes and asthma services to the state Medicaid beneficiaries of Louisiana, Illinois, Mississippi, and Florida at reduced rates.

89.    The failure to expend those sums guaranteed to be used for marketing purposes and

required to be capitalized as equity in the company, as an obligation by Defendants to the Medicaid Program, has caused damages non-exclusively in the form of unachieved savings intended, expected, and bargained for by Defendants herein with the Louisiana Department of Health and Hospitals.

90.    Because Defendants failed to spend those sums, and because the Defendants knowingly charged full price instead of the agreed discounts in the contract awarded, the Department failed to achieve the savings for which it had been contractually promised by Defendants to provide, comprising damages suffered by the program.

91.    Therefore, because of the knowing false statements, actions, and claims by the Defendants herein, the Department did not achieve its contractually obligated minimum savings, which would have been far greater had the Defendants performed as obligated under their agreement with the Department.

92.    Relator has specific knowledge of discussions with Defendant Allen Palles regarding the full prices charged to the Louisiana Medicaid Program as well as other State Medicaid Programs. As Chief Financial Officer Defendant Palles knowingly directed Defendant Health Alliance to charge full price for diabetes and asthma related services and drugs instead of the agreed discounts, and stated to employees and officers that it was necessary to maximize revenue, and that Health Alliance would merely pay it back as a recoupment when or if it got caught.

93.    Because of the systems that were in place while Relator Mark Swift was removed from management in early 2003, he has specific knowledge that the computer systems for each Medicaid beneficiary were set up in such a way that the discounts and prices to be charged were set on a per beneficiary basis.  That having been said, in order to overcharge the State Medicaid

Program on more than one occasion as happened here repeatedly, it would have to be manually done, and Defendants would have to override the system further demonstrating the knowing submission of false claims and statements to get monies improperly from the Medicaid Program.

94.    These Acts constitute violations of the False Claims Act, 31 USC §3729 et seq and the Louisiana Medical Assistance Programs Integrity Law.

95.    In addition to the allegations contained above, it was the direct and knowing conduct of Defendants herein to obtain the contract from the State of Louisiana, Department of Health and Hospitals, for the additional purpose of obtaining contracts from the States of Mississippi, Illinois, and Florida.  Specifically, Mississippi would not have granted their Medicaid diabetes and asthma services contract to Health Alliance, LLC but for the improperly granted program to Louisiana.

### Defendants Scheme to Take Medicaid Beneficiary Lists in Violation of Law and the Exclusive Contract with DHH

### Count IV – Illegal remuneration

96.    Plaintiff hereby incorporates Paragraphs 1 through 95 above, as if pled herein.

97.    In 2004, Health Alliance Officer John Hennessey was observed removing records from Health Alliance facilities, downloading confidential patient information and email addresses onto his personal computer, and removing his office computer from the facility.

98.    During 2005 and 2006, Hennessey disclosed to former officers, employees, and other individuals that he was intending to sell to third parties patient information and mailing lists obtained under the DHH Agreement and inquired if anyone they knew would be interested in purchasing the lists.

99.    The DHH Agreement expressly states that Health Alliance "shall not release, for any

18

purpose, any enrollee information to any persons or organizations unless such release is authorized in writing by DHH or authorized by this contract. **Exhibit 4, at Attachment A pg. 10, B.6**.

100.    Neither DHH nor the Agreement authorized the use of enrollee information for any purpose other than the proper discharge of Health Alliance's obligations to the Louisiana Medicaid program.

101.    Defendant Hennessey has on information and belief possession, in encrypted computer systems, the lists taken improperly from the Health Alliance Computer systems and maintains a copy of same.

102.    Such actions constitute violations of the False Claims Act, 31 USC §3729 et seq., and Louisiana Revised Statute § 46:438.2 states that, "No person shall solicit. . .(or) offer. . . any remuneration. . . to obtain a recipient list, number, name, or any other identifying information."

## Actions by the Individual Defendants in Perpetuating the Schemes Alleged

103.    During the relevant period, Defendant Jamie Martin, was a director and shareholder of HAH, a director and shareholder of Holdings, and the wife of Defendant E. B. Martin, Jr., and on information and belief, a member and manager of EBM Ventures, LLC, an investor in Acquisition. As a Director of HAH and Holdings, Defendant Jamie Martin was as aware of the schemes committed on DHH and State of Louisiana and participated in the schemes against the DHH and the State of Louisiana in that he actively ratified and participated in the concealment and conversion of the equity investment of MTs and Ashcroft to debt instruments against Defendant Health Alliance LLC's balance sheet, and also participated in the unauthorized transfer of the contract awarded by DHH to Defendant Health Alliance LLC to third parties without the written permission of DHH as

called for and required for in the contract and the addendum to the contract with DHH.

104.    Defendant John Hennessey, was an officer of Health Alliance LLC and Holdings during the relevant period.  Defendant Hennessey had knowledge of and was an active participant in the schemes committed on DHH and the State of Louisiana as he was a Vice President of Defendant Health Alliance LLC, and acted in his corporate capacity to perpetuate the concealment and scheme to convert the equity representations to DHH to debt and also directly participated in the transfer of the contract without DHH's permission to a third party entity, and also was a member of the Analyst Board which was required by DHH under the contract to meet and certify compliance with the contractual terms to provide diabetes and asthma related service to Louisiana Medicaid beneficiaries.

105.    Defendant Michael L. Anthony, was an officer of HA Acquisition and Health Alliance LLC during the relevant period.  On information  and belief, as the President of Health Alliance LLC and Acquisition Defendant Anthony was aware of the schemes committed on DHH and the State of Louisiana in that he was the Executive Vice President responsible for the transfer of the contract without seeking DHH's permission as required by the contract in question, to a third party entity, and as an officer of Defendant Health Alliance LLC directly participated in the concealment of the true nature of the investment/debt by MTS Ashcroft into Health Alliance LLC from the DHH.

106.    Defendant Curtis Lane, was a director of HAH before the May 2003 reorganization and was a director of Holdings and an employee or agent of MTS/ Health Alliance, LLC during the relevant time period.  Defendant Lane had knowledge of and was an active participant in the schemes committed on DHH and the State of Louisiana in that the September 20, 2002 letter he

authored to Helene Robinson, Executive Director of DHH on behalf of Defendant MTS and Ashcroft materially misrepresented the amount of the investment at the time as being $6,000,000 when in fact only $4,000,000 had been invested, and further materially misrepresented the truth by saying the balance would be funded on or before December 31, 2002, when in fact Defendants MTS and Ashcroft never intended to perform the final equity funding but rather replace said funding with a debt instrument which directly violated the prerequisites for the DHH contract in question.

107.    Defendant Andrew M. Paul, was a director of HAH before the May 2003 reorganization and was a director of Holdings, an employee of Ashcroft Associates, LLC, and was affiliated with MTS Health Alliance, LLC during the relevant time period.  As a Director of Holdings, and as an employee of Ashcroft Associates, LLC and affiliated with MTS Health Alliance, LLC, Defendant Paul had knowledge of and was an active participant in the schemes committed on DHH and the State of Louisiana by perpetrating the scheme to directly misrepresent the funding obligation commitment of MTS/Ashcroft to the DHH as being an equity investment, when the intent and scheme was to secure the contract from DHH and convert the final equity investment to that of a debt instrument burdening Defendant Health Alliance, LLC and preventing the unrestricted funding to Health Alliance, LLC demanded by DHH as a precondition or prerequisite to awarding the contract preventing the unrestricted funding to help Alliance, LLC demanded by DHH as a precondition or prerequisite to awarding the contract.  In addition, Defendant Andrew Paul participated in the transfer of the contract without DHH permission, knowledge, and transfer of said asset of Defendant Health Alliance, LLC to a third party entity while maintaining the debt on the remaining entity.

108.    Defendant Kevin Swan, was a director of Holdings, an officer of Health Alliance

LLC, and an officer of Holdings during the relevant time period. On information and belief, as CEO, President and Director of Health Alliance, LLC and Holdings Defendant Swan had knowledge of and was an active participate in the schemes committed on DHH and the State of Louisiana by actively transferring the sole asset of Health Alliance, LLC, namely the Louisiana contract to provide services for DHH to a third party entity without notifying DHH and seeking their permission as required under the terms of the agreement, and concealing same from DHH, as well as being an active participant in the conversion of the equity requirements of DHH to a debt instrument in violation of the terms and prerequisites to awarding the contract demanded by DHH.

109.    Defendant Malcolm Kostuchenko, on information and belief a citizen and resident of New York, was a director of HAH during the relevant time period. On information and belief, as a Director of HAH Defendant Kostuchenko had knowledge of and was an active participate in the schemes committed on DHH and the State of Louisiana by actively transferring the sole asset of Health Alliance, LLC, namely the Louisiana contract to provide services for DHH to a third party entity without notifying DHH and seeking their permission as required under the terms of the agreement, and concealing same from DHH, as well as being an active participant in the conversion of the equity requirements of DHH to a debt instrument in violation of the terms and prerequisites to awarding the contract demanded by DHH.

110.    Defendant E. B. Martin, Jr., is the Chairman of Acquisition, is on information and belief the manager and a member of EBM Ventures, and is the husband of Jamie Martin. On information and belief, as the Chairman of Acquisition, Defendant E. B. Martin was aware of the schemes committed on DHH and the State of Louisiana had knowledge of and was an active participate in the schemes committed on DHH and the State of Louisiana by actively transferring

22

the sole asset of Health Alliance, LLC, namely the Louisiana contract to provide services for DHH to a third party entity without notifying DHH and seeking their permission as required under the terms of the agreement, and concealing same from DHH, as well as being an active participant in the conversion of the equity requirements of DHH to a debt instrument in violation of the terms and prerequisites to awarding the contract demanded by DHH.

111.    Defendant John Sabalaskey, was an officer of Health Alliance LLC and Holdings during the relevant time period.  On information and belief, as CFO, Treasurer, and Secretary of Health Alliance LLC and Holdings, Defendant Sabalasky was aware of the schemes committed on DHH and the State of Louisiana had knowledge of and was an active participate in the schemes committed on DHH and the State of Louisiana by actively transferring the sole asset of Health Alliance, LLC, namely the Louisiana contract to provide services for DHH to a third party entity without notifying DHH and seeking their permission as required under the terms of the agreement, and concealing same from DHH, as well as being an active participant in the conversion of the equity requirements of DHH to a debt instrument in violation of the terms and prerequisites to awarding the contract demanded by DHH, in addition to knowingly failing and actively concealing the balance sheet of Health Alliance, LLC which represented the debt instrument of MTS/Ashcroft that was knowingly misrepresented and falsified to DHH in order to procure the contract under false pretenses and under fraudulent inducement.

112.    Defendant Allen Palles, was an officer of Health Alliance LLC and Holdings, during the relevant time period, installed by the equity investor/creditor MTS/Ashcroft.  Defendant Palles had knowledge of and was an active participant in the schemes committed on DHH and the State of Louisiana had knowledge of, and was an active participate in the schemes committed on DHH and

the State of Louisiana by actively transferring the sole asset of Health Alliance, LLC, namely the Louisiana contract to provide services for DHH to a third party entity without notifying DHH and seeking their permission as required under the terms of the agreement, concealing same from DHH, as well as being an active participant in the conversion of the equity requirements of DHH to a debt instrument in violation of the terms and prerequisites to awarding the contract demanded by DHH, knowingly failing and actively concealing the balance sheet of Health Alliance, LLC which represented the debt instrument of MTS/Ashcroft that was knowingly misrepresented and falsified to DHH in order to procure the contract under false pretenses and under fraudulent inducement, in addition to materially misrepresenting the funding instrument in the 2002 correspondence to Helene Robinson at the DHH, knowingly authorizing employees of Health Alliance, LLC to bill full price amounts rather than the contracted discounts for diabetes and asthma drugs and services as required in order to maximize revenue for Defendant Health Alliance, LLC in violation of the exclusive contract and the terms of the 1915(B) waiver issued by CMS.

113.    Defendant James Kelly, was an officer of Health Alliance LLC and Holdings, and a director (Chairman of the Board) of Holdings during the relevant time period.  Defendant Kelly actively participated in the debt acquisition falsely represented to DHH as an equity infusion, and also was a participant as an Officer of Alliance in the concealed transfer of the property (the exclusive contract) without notifying or seeking consent of DHH as required.

114.    Through the acts described herein, and otherwise, Defendants, their agents and employees, controlled subsidiaries, and contractors, knowingly presented and caused to be presented to the United States Government and State Governments participating in the Medicaid Program, false and fraudulent claims, records, and statements in order to obtain reimbursement

24

the health care services has provided under Medicare and Medicaid.

115. Through the acts described above and otherwise, Defendants, their agents and employees, controlled subsidiaries, and contractors, knowingly made, used, and/or caused to be made or used false records and statements in order to get such false and fraudulent claims paid and approved by the United States Government.

116. Through the acts described above and otherwise, Defendants, their agents and employees, controlled subsidiaries, and contractors, knowingly made, used, and caused to be made or used false records and statements to conceal, avoid, and/or decrease Defendants of obligation to obtain money or provide savings to the United States Government and the State Medicaid Programs that Defendants improperly and/or fraudulently received. Defendants also failed to disclose to the Government material facts that would have resulted in substantial repayments by them and others to the Federal and State Governments.

117. The United States, its fiscal intermediaries, and the State Medicaid Programs, unaware of the falsity of the records, statements, and claims made or submitted by Defendants, their agents and employees, controlled subsidiaries, and contractors, paid and continued to pay Defendants and others for claims that would not be paid if the truth were known.

118. Plaintiff, the United States of America, its fiscal intermediaries, and the State Medicaid Programs including that of Louisiana, unaware of the falsity of the records, statements, and claims made or submitted by Defendants, or of their failure to disclose material facts which would have reduced Government obligations, have not recovered Medicaid funds that would have been recovered otherwise.

119. By reason of the Defendants false records, statements, claims, and omissions, the

United States and the State Medicaid Programs have been damaged in the amount of at least 10 million dollars per year for that of the Louisiana Medicaid Program, which were contractually guaranteed savings which were deprived of the program based on the actions of the Defendants herein.

120.    This is a claim for treble damages and for forfeitures under the False Claims Act, 31 USC § 3729, *et seq.* as amended.

121.    Through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and with others to defraud the United States Government and the State Medicaid Programs, including Louisiana, by getting false and/or fraudulent claims allowed or paid.  Defendants have also conspired to admit disclosing or to actively concealing facts which, if known, would have reduced Government obligations to them or resulted in repayments from them to Government programs.   Defendants have taken substantial steps in furtherance of those conspiracies, *inter alia* by preparing false reports and other records, by submitted such records to the Government for payment or approval, and by directing their agents, consultants, and personnel not to disclose and/or to conceal Defendants false records, reports, statements, disclosures, claims, and other fraudulent practices.

122.    The United States Government, its fiscal intermediaries, and State Medicaid Programs, including but not limited to Louisiana, unaware of Defendants' conspiracies or the falsity of their records, reports, statements, disclosures, and claims made by them, their agents and employees, controlled subsidiaries, contractors, and co-conspirators, and as a result thereof, have paid and continue to pay millions of dollars in Medicaid reimbursements that they would not otherwise have paid.   Furthermore, because of the false reports, records, statements,

disclosures, and claims made by Defendants, the United States, its fiscal intermediaries, and State Medicaid Programs, including but not limited to Louisiana, have not recovered millions of dollars of Medicaid funds from the Defendants that otherwise would have been recovered.

123.    By reason of the Defendants' conspiracies and acts taken in furtherance thereof, the United States and State Medicaid Programs have been damaged an amount to be determined at a trial of this matter.

124.    Relator hereby prays for and demands a trial by jury in this matter.

WHEREFORE, the Relator, Mark Swift, prays for judgment in favor of the United States, the State Medicaid Programs, including that of Louisiana, and the Relator, against Defendants has follows:

a) That Defendants cease and desist from violating 31 USC § 3729, *et seq.*;

b) That the Court enter judgment in favor of the Plaintiff, the United States of America, the State of Louisiana, and other State Medicaid Programs affected herein, and in favor of the Relator Mark Swift, against Defendants in an amount equal to three times the amount of damages the United States and the State programs have sustained as a result of Defendants' actions, plus interest, as well as the maximum civil penalty against each Defendant for each violation of 31 USC § 3729, *et seq.*;

c) That the Realtor Mark Swift be awarded the maximum amount pursuant to 31 USC § 3730(D) of the Federal False Claims Act;

d) That the Plaintiff the United States of America, the State of Louisiana, and the Relator Mark Swift, be awarded all costs, attorney's fees, and expenses of the action; and

d) That the Plaintiff the United States of America, the State of Louisiana, and the Relator

27

Mark Swift, receive all such other general and equitable relief as the Court deems just and proper.

Respectfully submitted,

**VEZINA AND GATTUSO, L.L.C.**
401 Weyer Street, P. O. Box 461
Gretna, Louisiana  70054
Telephone: (504) 368-5223
Facsimile: (504)361-3624

J. Marc Vezina, T.A., LSBA #24683
jmv@vezinagattuso.com


J. Burton LeBlanc, LSBA#20491
Pat O'Connell, TX Bar# 15179900
Jan Soifer, TX Bar # 18824530
**BARON & BUDD, P.C.**
6955 Perkins Road
Suite 100
Baton Rouge, Louisiana 70808
Telephone: (225) 927-5441

**Attorneys for Relator**

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

UINTED STATES OF AMERICA,
THE STATE OF LOUISIANA, THROUGH
THE MEDICAL ASSISTANCE PROGRAMS
INTEGRITY LAWS
ex rel. MARK SWIFT

CIVIL ACTION

**PLAINTIFFS**

NO.

**VERSUS**

SECTION:

JAMIE MARTIN, CURTIS LANE, JAMES
KELLY, JOHN SABALASKEY, ALLEN
PALLES, ANDREW M. PAUL, KEVIN SWAN,
E. B. MARTIN, JR., JOHN HENNESSEY,
MALCOLM KOSTUCHENKO, MICHAEL L.
ANTHONY, HEALTH ALLIANCE, LLC,
HEALTH ALLIANCE HOLDINGS, INC.,
HA ACQUISITION LLC, HA HOLDINGS,
INC. and PREVALANCE HEALTH

MAGISTRATE:

COMPLAINT UNDER THE
FEDERAL AND FALSE CLAIMS
ACT

JURY TRIAL REQUESTED

FILED *IN CAMERA* AND
UNDER SEAL

**DEFENDANTS**

### Declaration of Mark Swift

I, Mark Swift, do hereby declare, certify, verify, and state pursuant to 28 USC 1746(2), and under penalty of perjury, that the statements contained in the Complaint are true and correct to the best of my knowledge, information, and belief. Executed within the United States of America, State of Louisiana on April 29, 2008.

_____
Mark Swift